A number of issues have been briefed, and with the Court's permission, I'd like to focus on three issues today. First, the correct construction of the claim language detecting a complex as formed between said probe and said nucleic acids of HCV. Second, the greater weight of the evidence showing anticipation of the 704 patent by the CHA PCT application. And finally, the District Court's preclusion of Abbott's obviousness defense based on an erroneous application of the teaching suggestion and motivation test. Turning first to claim construction, the plain language of the process claims at issue in this case requires detection of an actual probe target complex. Detecting a complex as formed between said probe and said nucleic acids of HCV. The claim language complex as formed was chosen by the patentee to particularly point out and distinctly claim the subject matter of the invention. But contrary to this Court's well-established principle that claims must not be construed in a manner that eliminates or ignores claim language, the District Court's construction essentially read the as formed language out of the claim. The term as formed doesn't encompass used to exist. And that was the meaning that the Court ascribed to her construction has been formed. The Court removed the temporal limitation that was imposed by the plain meaning of as and broadened the claims so that they were no longer limited to detecting probe target complexes as formed. The Court's construction was not supported by any intrinsic evidence. Every example or discussion of the invention in the specification describes direct detection of a hybrid, an actual complex formed between the probe and its target, as the patented process. As this Court noted in Phillips, claims must be read in light of the specification, which makes clear what the inventors did and did not invent. The correct construction of the claims is going to be the one that is aligned with the description of the invention in the specification because that is what would be understood by a person of ordinary skill in the art at the time. There is no teaching at all in the specification for this patent about how to detect a fluorescent molecule in solution after a probe target complex has been destroyed. That was not in the state of the art in 1992 when this patent application was filed, as the inventors admitted. Counsel, the specification contemplated the use of fluorescence. It gave that as one of the possible examples. Tell me, what is the method then of using the fluorescence that is so substantially different from the method? What did the patent contemplate when it used the word fluorescent in the spec? Obviously they contemplated something. What was known in the art at the time, and in fact this is disclosed in the CHOP PCT application, was using fluorescence or radioactivity as part of the probe target complex to detect the probe target complex. But not destroy it. But not destroy it. And the probe target complex was detected, and the fluorescence was part of the complex that was detected. The difference in real-time PCR, which is a different method that Abbott uses and which came along later, is that any complex that is formed is completely destroyed, and what is detected is a fluorescent molecule that is free-floating in solution and is not part of the complex. But here's my problem. The specification doesn't say the use of fluorescence the way you're describing it. It just gives fluorescence as a possible use, right? And there is factual evidence in the record that real-time PCR existed at the time this patent application was filed. I understand you disagree with that evidence, but it is a determination of fact that was made by the district court that we can only overturn for clear error. So the specification contemplates fluorescence. The district court found as a matter of fact that their exact use of fluorescence existed in the prior art at the time this patent application was filed. How am I to ascribe the meaning to fluorescence that you're suggesting rather than think that possibly when they used the word fluorescence in this fact, they were contemplating exactly this use? Actually, Your Honor, I'd like to answer the first part of Your Honor's question first. I realize it was a long question, and I'm sorry. The district court actually found as a fact in finding infringement that real-time PCR did not come along until after the 704 patent had issued. I believe at page 712 of the appendix is the quote, and it's in our brief as well, that the district court stated as she was finding literal infringement, she was at the same time finding it. I see. So it was a forfeiture. That was the reason that you weren't allowed to raise that as the argument below, because you forfeited it below? Well, I don't think it was forfeited below. I think that was part of it. I can understand why Your Honor is saying that, and I would address that. But just to finish this thought first, the district court did say that it infringes the patent because some other thing came along. One of them is real-time came along. Where are you reading from? I'm sorry. Where are you reading from? I'm reading from page 712 at line 19 of the appendix, and the court says one of them is real-time PCR came along pretty soon after the patent issued. I wanted to address one more thing on that, because in the court's post-trial order, when she denied further review on the infringement issue, the court made the comment that real-time PCR was disclosed in the Resnick patent, and I think that might be where Your Honor got the idea that you thought that real-time PCR, or came to the conclusion that it was disclosed earlier. That's an incorrect conclusion by the court, and I think I can understand the court's misunderstanding. As you go through the literature in this area, you see the acronym RT-PCR. That is an acronym used in the Resnick patent. It's used in a Cha article. That acronym does not mean real-time PCR. That acronym means reverse transcription PCR, which is what all of the prior art was about at that time in the area of genotyping viruses. Let me make sure I understand the scope of your argument about the real-time PCR. Is that argument tied and necessarily tied to your argument about as-formed, or is it an independent argument? By that I mean that if the claim did not have the words as-formed in it, would you still be arguing that you don't infringe because this particular technology came along later? What we would be arguing as we are arguing here is that the claim terms cannot be construed to literally encompass a technology that the inventors did not invent and that came along later. It necessarily would fall into the area of an equivalence analysis, which was not made in this case and which I would submit wouldn't be a successful analysis here because you still can't read out an element of the claim. But at the very least, the court's finding of literal infringement based on a technology that innogenetics did not invent is wholly improper. You're saying that the literal language of a claim can never embrace subject matter that didn't exist at the time the claim was filed? Well, it can't. Isn't that what you're saying? It can't embrace subject matter that was not in the state of the art at the time the claim was filed under this court's decision in sharing the Amgen, for example, where there was a particular claim term covering a drug compound. And as time went on, that drug compound was found to have different types and subtypes that were embraced by the same claim term. And so the patentee claimed that Amgen infringed their patent with these later developed compounds. And this court found that that can't be the case, that there can't be literal infringement. And the claim term in the sharing case, I think it was something like IPO or IPF, can't be found to literally encompass something that the inventors didn't even know about. There's no dispute in this case that the inventors didn't know about real-time PCR. There may be a dispute as to whether it was in the state of the art, but the inventors didn't know. Somebody had a claim that said, I've got two pieces of cloth fixedly attached with a fastener, and it passed muster and got out. And later on, somebody comes along and uses Velcro that didn't exist at the time. They're saying that the claim couldn't be construed broad enough to reach the Velcro. I think, Your Honor, it would be an equivalence analysis. Was Velcro a fastener that was equivalent to the fastener? Why do you have to ask that? A claim as broad as broad. Well, I think you have to interpret claims in light of the specification. The claims can't be completely divorced from the invention that the inventors claimed. On page four of the genetics brief. That's why I wanted to ask the question to come back to the issue that Judge Bryson asked you about. If you lose on that claim construction, having a hard time figuring out how important it should be for claim construction that a particular embodiment of fluorescence didn't exist, maybe at the time the claims were filed, but the patentee or the applicant was prescient enough to say in his application, you know, you may well be using fluorescence to assist in this detection. Well, the fluorescence that existed at the time, and fluorescence was not the invention, and fluorescence, use of fluorescence existed at the time, as did radioactivity to label probes. And the difference there was that what was in the contemplation of the inventors and what you can see by not only the embodiments. Help me out a little bit. In the prior art, would fluorescence have been used to indicate the presence of a complex as formed, as opposed to finding out after you destroy it? That's correct, Your Honor. It would be used to detect the actual complex. It was part of the complex. It was not separate from the complex in the prior art. I think that real-time PCR. You could tweak the prior art, if you will, to say, well, instead of identifying the complex while it still exists using a fluorescent methodology to do so, since we don't need this stuff, we'll just kill it off, and then the answer will come after you kill it off instead of before. Am I missing something? I think you have to go back to the fact that this is a method patent. On page 4 of Intergenetics brief, as they can see, their claim is for a particular method of genotyping. The method of real-time PCR is a different method. It doesn't include the step of detection of a complex as formed, which they claimed. But then you're going back to the as formed. Correct. Would you give the same answer if the as formed was struck? Well, I think you have to give effect to as formed. The court made the statement that you could just leave it out and the claim would be the same. Well, I understand that argument, but what I'm getting at is the same question I asked earlier, which is that you're making really two arguments. One is as formed carries weight for present existence during testing and ultimate detection. And the second argument that you were making in your response to me and to Judge Clevenger, it seems to me, is that because a different method of detection is used than is set forth in the specification and was present in the state of the art at the time, no matter how broadly the claim is written, even if it's written to say all possible methods of detection, it can't read on something which hadn't been invented at that point. I believe that's a correct statement of the law, Your Honor. So that's why you would say it with respect to the Velcro. As long as Velcro didn't exist, it doesn't matter whether the specification says we intend to cover all fasteners. That just wouldn't be construed to include something that didn't exist at the time on the day of the application. That's correct, Your Honor, unless it was... I mean, you would have to go to an equivalence analysis and find if it was equivalent. And just in my rebuttal time... Well, we're going to give you a little extra time because we've peppered you with questions, so you can go ahead and proceed. Thank you, Your Honor. I didn't want to pass over Judge Moore's question about forfeiture. I know you asked me that as to whether the after-acquired technology question was not considered because of forfeiture. What happened in this case is that the court construed the claims 17 days before trial without a hearing and found that she construed the claims in the context of Abbott's summary judgment motion of non-infringement, finding there were questions of fact relating to infringement. Abbott reasonably believed, I think, that they were coming to a trial on infringement and proposed a jury instruction to deal with the court's construction. It didn't adopt the construction of either party, but Abbott's instruction, which prompted this whole discussion, was to explain the law as a quote out of the cases, that the claim terms can't be literally construed to encompass technology that was not known and available to one of ordinary skill in the art. And that was what the court was responding to. Thank you, Your Honor. Well, why don't you, if you would, it would certainly help me, and I think with the indulgence of counsel and my colleagues, if you could address, and we will give you extra time, the question of anticipation, and with particular attention to, I guess it's Dr. Robinson's testimony. Dr. Patterson? I'm sorry, did I say Patterson? Patterson, yes, Patterson, I'm sorry. With regard to the Resnick patent. Yeah, with respect to Resnick. With respect to the Resnick patent? Yes, Your Honor, the court granted judgment as a matter of law on the Resnick patent without addressing the content of that patent at all. The court granted judgment as a matter of law because she believed that Dr. Patterson's conclusion of anticipation of claims one and two by the Resnick patent was based on a construction of genotyping that was not the same as the court's construction. Right. In fact, Dr. Patterson's, well, Dr. Patterson's report was created before the court's claim construction, but it referred to genotyping as detecting and classifying. He didn't use the exact word distinguish, but when he was testifying at trial, he testified. Didn't the district court judge say, I'm going to ignore Patterson, Dr. Patterson's testimony, because he has a different interpretation of the claim in suit than I have? No, I don't believe that's correct, Your Honor. I believe it was his construction of genotyping that, well, her belief that he wasn't applying her construction of genotyping to the Resnick patent. That's what I'm saying, same thing. So what I was trying to find in the record where Dr. Patterson was testifying as to his understanding of the scope of the claims in suit as opposed to the claims in the 718, your brief at page 51 says Dr. Patterson testified that the 718 patent disclosed the method of genotyping based on the court's construction, citing a 757C as in Charlie through 757F as in Frank. It's in volume 4. He testified at 757C that the 718 patent discloses methods of distinguishing hepatitis C genotypes by means of PCR-based assay and probe hybridization in the 5'UT of the hepatitis C gene. Yeah, I understand that, but I mean, I was looking for testimony where Dr. Patterson was saying, starting off by saying, as I understand the 704 patent, the 704 patent deals with X, and I didn't see any testimony where Patterson was telling me what he thought the patent in suit scope was. Well, I believe that Dr. Patterson, all of his testimony, the jury had understood how the court had construed the claim terms, and all of his testimony was based on the court's construction, which was the method of genotyping. But Judge Crabb disagreed. We have a U.S. District Court judge saying, with regard to Patterson, there's a disconnect between the way you, Dr. Patterson, are looking at the claims in the suit and the way I'm looking at it. If she's right, I think you would have to agree, if she's right, there was a ground to dismiss Patterson's testimony. Well, she did say that, Your Honor, but she did not explain that at all. There was nothing in the testimony. Well, whose burden is it to convince me that the District Court was wrong? Well, it's our burden to convince you that the District Court is wrong, Your Honor. But what I was going to say is that Dr. Patterson testified, and this quote shows that exactly in accordance with the court's claim construction, when she said that she thought he didn't, there was no explanation. And Evett's counsel argued, but Dr. Patterson . . . Right, but, I mean, the problem I had was that there's a lot that goes on in a trial. Some of it gets recorded, some of it doesn't. There obviously was a view from the District Court judge here to say, Dr. Patterson, you know, you're a fine fellow, but you and I are not seeing the claim in suit correct the same way, and so I'm not going to pay attention to what you say. If you look at Patterson's declaration, which is in a different volume, it's at Volume 3. Pardon me, Dr. Patterson, I should be more polite. And you look at page 529, he's talking, I believe, about the various disclosures in the Resnick patent. That's correct, Your Honor. And what's he talking about when he says, this probe would detect and classify strains, a synonym for types? I think on page 529, Dr. Patterson is talking about claims that were not an issue at the trial. The trial only involved claims 1 through 3, because shortly before trial, Intergenetics dropped all of the other claims that it was suing Evett upon. So with respect to Dr. Resnick . . . You think this reference on 529 doesn't help me to figure out what Patterson, how Patterson was understanding the relationship between Judge Crabb's interpretation of Claim 1 and his understanding of what Resnick taught? May I refer the Court just a page earlier to page 528, where Dr. Patterson begins to talk about the 718? He explains that the patent teaches and discloses oligonucleotide . . . Where are you on that? I see, I see. It's C1. The 718 patent, fine, but what is it? It's a method of detecting and classifying. It's a method of detecting and classifying. But in terms of the claims ensued, the claim is limited to identifying specific individual strains, right? Well, as was the Resnick patent, Your Honor. It's a question of . . . I'm sorry, go ahead. I was going to say that the Court viewed the word classifying differently than distinguishes. Dr. Resnick didn't use it that way. That's the key question that I kept stubbing my toe on, is can you lay out for us what the dispute was between Dr. Patterson and your trial team, which used the word distinguish, at least in his testimony, versus detect and . . . have I got it backwards? Detect and classify was one characterization. Distinguish was another. And I'm hard-pressed to understand what the kernel of distinction was between the two. What is your understanding of the distinction? Honestly, Your Honor, we don't think there is one. Maybe I'm asking the wrong person. But what do you understand Judge Crabb to have understood by that difference? Well, I think that she was using the word distinguish, as Dr. Cha did in his application, to mean distinguishing among the various types and subtypes of the HCV virus. Genotyping, as noted in the 704 patent, is a type of detection. The inventor himself defined genotyping at trial as detection and classification because that is the process. The examiner, in allowing the claims, allowed the claims as . . . Well, what she said specifically in allowing the claims was that genotyping is a special type of detection where you distinguish among the types and subtypes. And getting back to Judge Clevenger's point about the 718, that's exactly why Dr. Patterson, at trial, when he was describing and testifying about the 718 patent, used the word distinguished, which was the court's word, because in his mind and in our mind they mean the same thing. But in her construction, instead of using the word classify, she used the word distinguish. And we didn't appeal that claim in construction. We think they are the same thing, that when you detect a particular type of the HCV virus and then you classify it, you know what it is, you're deciding what it is as opposed to what any other strain is. When you detect the virus, the type of the virus, and you distinguish it, you're doing the same thing. You're distinguishing it from the other strains. There's very little by way of discussion in the record, that I could find at least, of this point. Judge Crabb makes a quick allusion to it in the course of what appears to be a bench conference that I found. Is there any place where this gets laid out in sufficient detail that we could understand the distinction that she saw between the two? She clearly saw a distinction. She did at the time of, I think that her summary judgment order, and I don't have a particular phrase in mind, but that would be about the only place I can think of where she might have expressed an opinion about that, because there wasn't any real dispute at the trial. The construction that she had, distinguishing, was to Abbott the same as classification, and all of the prior art and everything that was discussed was discussed in terms of the court's claim construction. That method of genotyping meant classifying or distinguishing among the various types and subtypes of HCV. When the court entered judgment as a matter of law on the Resnick patent, she didn't address the content of that patent at all, gave no explanation other than to say, well, I'm not going to allow the Resnick patent because I think your testimony was based on a construction of genotyping that wasn't my construction. There is no other explanation of that. Very well. I think we've gone over a bit. Why don't we hear from Mr. Skilton. Mr. Skilton, you can take extra time if you need it. Well, I will do my best, Your Honor, to answer what the court has its fingers on as the issue in the case. But before I do so, I would refer the court specifically to Judge Kraft's summary judgment and claim construction order, as well as her MOL. And most importantly, I would refer the court to the testimony of our experts, Dr. Resnickoff and Dr. Norman. But let me see if I can address the difference between classifying, distinguishing among, and what was the essence of it. To read that and to understand what Judge Kraft ultimately understood is first to read the patent and its specifications. But the three constructions, not just one, they've appealed one, detecting a complex's form. The court has gone over those questions. But the two that are key to the questions that the court has asked counsel is first the definition of the method of genotyping. That's a preamble statement, right? Does everyone agree the preamble in this case is a limitation? You know the case law says it's normally not. It is because it also takes definition from the spec and it tells the court what it is that is being claimed as a method, a method of genotyping. And it's important because it goes right to the key limitation then of specific hybridization. And that limitation is the one really to consider in the classifying in the method of genotyping of distinguishes among subtypes, types and subtypes, and classifies the HCV into a genotype or subtype. So you start with that as the definition. And then how does it do it? So there would be no need to specifically hybridize if you were just detecting rather than genotyping. Specific hybridization is the key, Jeff. You're right. And what it does is to tell you not only what you have, but most importantly what you don't have. It doesn't double detect. It doesn't get a false read. You don't get two reads on one. And you know if you've got a type 1, if you're doing genotyping with specific hybridization, that you don't have a type 2. Now, at the risk of getting ahead of you, I'm still not clear, if you'd already covered this, I'm not clear that I understood. I'm struggling with the distinction between detect and classify versus distinguish. What was it that Judge Crabb understood to be distinguish? What she saw was the invention here, and that was the ability to, on a simple test, to identify what is not only amongst the group that's in the contaminated or diseased blood, but the particular subtype or subtype, and to have a definite read so that you know that there is no other type or subtype in that. And it's that invention that permitted the persons, the docs in the field, the people who are using this, to know what the treatment protocol was. Interferon can be applied at different levels and for different lengths. But why isn't that fairly contemplated by both sets of terms? What is it? Well, it's one thing to say you can classify, but it's another thing to say you can't classify, you don't have the type or subtype. It's the negative read here. It's the ability to exclude. It's the ability to say, I know what I have and I know what I don't have. And let me go right to... Well, but if you're distinguishing between two things, why aren't you making that same positive and negative determination? Because in distinguishing between the two, you may or may not be able to say that you don't have something else in the contaminated sample. You might be able to say, I've got A and B, but you can't say the negative. I don't have type 1C or 1D. And that's the point. It's the full scope of the process of elimination. It's all elements of that process of elimination that is practiced. Is there any point at which Judge Crabb goes through essentially the same analysis that you just went through with us? I believe you'll find it in several places. First, I think she does so at least conceptually. I thought in her summer judgment opinion. And the court may... But I'll tell you where, Your Honor, it really does show. Because the evidence isn't silent on this point. No, no, no. Sure the matter is that unless she's really incredibly smart, she probably wouldn't have figured that out on her own. So did you give a claim construction arguments or somehow give her a brief? Yes, we did. And did your brief lay out this distinction? To the best of my ability to do it today. But I don't think we have copies of those briefs in the appendix. Yes, Your Honor, what you do have is a copy. Yes, we do. Or no, yes, we don't. I apologize. No, no, it's nothing to apologize for. You didn't cite them, so that's fine. But I just wanted to make sure that if I look for them in this appendix, I'm probably not going to find them. I think you'll find this distinction in the intrinsic evidence. It's in the specification. As you read the spec, you'll see that the double concept. Well, certainly there's nothing in the spec that says it's not enough for purposes of performing the claim method to distinguish amongst. You must both detect and classify. There's no language like that in the spec. Well, Your Honor. We're looking for something crisp. Crisp that draws this distinction so that we would understand then why Judge Krabb is looking Dr. Patterson in the eye and saying, you're only talking about distinguishing. I'm talking about class detecting and classifying. Yeah, and I believe that in claims construction there were declarations. The record that I'm being cited to by my colleague is A656 through 67. And that's the summary of judgment opinion on this. 656. 656 through 67. A656 through 67. The Resnick patent does not appear to disclose genitalia rather being limited to detecting. Is that what? Yeah, here. Our specific question now is to Resnick, which was, I think, a related question before he asked for counsel. And here is her primary distinction on Resnick articulated there. I don't see it. In the middle of the page? Resnick 718 does not appear to disclose, et cetera. The trial, I believe, by the way, there were declarations to the court on claim construction. Well, but this is a different – I mean, I understood this to be making a different point. There she says it's limited to detecting. It is not directed to classifying into genotypes. But the distinction that seems to be drawn at trial was detect and classify versus distinguish. And distinguish is among. Distinguish is among. The operative definition, Your Honor, is the combination of method of genotyping and specifically hybridizing. And to look at Resnick, to look at CHOP, is to look at our experts' analysis of it. By the way, we're not talking of a preserved MOL on anticipation. The court's aware of that issue. They did not move for MOL. They're asking for a new trial on anticipation. And so that is an issue of is there evidence, basically. Right, but the new trial is clearly in play. I mean, that claim is clearly in play even if the GMO is not. And specifically hybridizing is the, I'm going to say, the litigated issue here throughout the testimony. And again, I refer to the court to how that was defined by the court. And it was a definition that was carried through by expert testimony in the record. Dr. Warman in particular not only testified to the technology under these claim constructions but had a demonstrative exhibit that showed what the difference was when you got probes that came from, for example, the envelope region that hit a so-called target that had been amplified in the five-prime area. And that's, by the way, what Example 2 of the CHOP PCT showed. And in that instance, he indicated that there you had an example of nonspecific hybridization. You had false reads, whether it was the primer problem or whether it was probes from another area that were cross-reacting. Okay, now, again, I'm sorry, go ahead. No, no, I'll stop. No, no, no, please, I cut you off. Well, I'm just saying that the way to analyze these disclosures was in a combination of the words used and the experiments performed to determine whether, in fact, they disclosed in their four corners a method of genotyping with specific hybridization. This wasn't a matter of conclusory statements made by experts on our part. It was on their part, which is one of the fundamental flaws of Patterson. But rather, it was an analysis of the terms as defined by the court with the look at the biochemistry and the issue of how the probes were, in fact, hybridizing. Now, specific hybridization, what is the definition of that term as settled upon by the court? And that's really, in a way, we bring this whole discussion in terms of classifying and distinguishing into real life and practical terms with the claim limitation of specifically hybridizing. And I'll read the court's claim construction. Hybridizing a probe to a target sequence and not to a non-target sequence. See, the issue of detecting has been known in the art. One of the things that is interesting for the court, I believe, is to look at 8.3286. That is where the examiner's notice of allowance is contained. And a lot of the arguments that are purveyed through the appellant's brief are addressed in the examiner's comments with respect to both the chemistry and the differences between the prior art disclosures and what the claims claim that are limited to. The analysis of Graham versus John Deere is well looked at in the KSR as part of the victim. And I want to just read a bit of the whole context. With the court's permission, I'll read what I'm referring to. Although the sequences of several HCV5 UTR are known in the art. That gets to the child question, do you acknowledge these are identical sequences? So the examiner knew they were known in the art. And genotyping methods are known in the art. And what were they at that time? These were these elaborate sequencing. You'd send it off site and you'd have a whole genome sequence, basically. So that was genotyping and that was for the purpose of classifying and distinguishing among and to be sure you had it and not something else. That's what the sequencing was able to do for you. So reading on. It is not suggested or motivated to use the 5 UTR for genotyping. Indeed, the ordinary artisan would be motivated to avoid the 5 UTR for genotyping because of its high sequence of conservation. The guts of this invention was to take an area of the genome, which Jot in other writings indicated you couldn't use for genotyping. You had to sequence. And against common wisdom, with the examiner, by the way, as Judge Crabb noted in her summary judgment opinion, having a simultaneous examination of the child, 717, which went to patent on detecting, it was this invention that the examiner saw after her review of the art, which was basically the guts of this invention. It's the guts of Judge Crabb's claim construction. It's the guts of our view that Cha doesn't anticipate. It is the reason why. Was 718 the resnick in front of the examiner? Your Honor, to see the way that's best disclosed, I'd start with the inequitable conduct decision of Judge Crabb wherein this apocalypse declaration, our expert. I thought you could give me a yes or no answer. Yes is the answer. You mentioned inequitable conduct. I'd like to ask you just a side question, if that's okay, if I redirect you for a second. If I understood the lower court's opinion properly, they found the case exceptional on the ground that there was no evidence of intent shown. Is that correct? Yes. And wouldn't that presuppose a credibility determination that the attorney involved, who was also aware of the European prosecution, when he says, I didn't even read those references, I just put that statement in my IDS or prior art disclosure, and oops, sorry. She then went on to clearly make what seemed to me to be a credibility determination that, oh, he didn't even read these, we shouldn't hold him accountable. Wouldn't that be evidence of intent, though, that would possibly prevent summary judgment on the issue of intent? I think not. Why not? Well, first of all, the United States Patent Attorney is the deposition, or the deposition you referred to in that, and it came from, remember, it's the patentee. And the patentee, there was a European application, and the entirety or the entire crucial art references from that, the international patent search, were produced. And those two copies. This has nothing to do with intent. What I want to know from you is intent. The only basis upon which she ruled this case was exceptional was intent. She said no evidence of intent was presented. And it seems to me that she based that upon a credibility determination that the prosecuting attorney, when he said none of these prior art references are relevant to this invention, and then he later take it back and said, well, oh, I didn't even read them. Sorry. I don't think that's relevant, the I didn't read them, sorry, because the fact is there's no intent to deceive on his part. You can't take the negative of that. He, in fact. He stated none of these relate to the invention, and later claims he didn't even read them. So how could that not? That's a statement that he got from his inventor. And the fact of the matter is that the inventor disclosed the international search report. It had those. That art was in front of the examiner. It's not an intent to mislead. That's all. Clearly he wanted the examiner to believe that these things were not relevant. I don't believe that's a fair inference at all. He said none of these relate to the invention claim. And my view of that is that this was, and these were methods of detecting, methods of detecting, the CHOPPCT, methods of detecting, and this was a method of genotyping. It's the very distinction the examiner found upon her review. And these very references were in front of the patent office, put in there by us. Was the same attorney who made the statement also involved in the European prosecution in any way? Was he aware of it? I'm sure he's aware of it. I mean, he got the materials that are the international search report. So clearly he was aware of it. But I believe the court is one layer down here from what I believe Judge Pratt found, and that is there's no basis to infer an intent to deceive here. And that's overwhelmed by the evidence as to what in fact was in front of the patent office, including what we submitted. And the argument, it was at best an argument of a lawyer, and in any event it doesn't relate to the invention as they understood it. And it was not specific as to a given piece of art. The particular piece of art maintained its X reference, highly material. That's what it means in the European patent office. As it went into the patent office at some point, I think you can rightly say the patent office did its job, particularly when it's examining at the same time the CHOP PCT. And that evidence is a combination summarized in her inequitable conduct. Counsel, that all goes to the materiality, and it also goes to whether or not there's an omission. But it doesn't go to the prong of intent. And the prong of intent is the only basis upon which attorney's fees were awarded for exceptional case. And that, it seems to me, we have to review to see if it's clearly erroneous. And I'm just asking you with regard to the evidence of intent. I agree. I understand your arguments with regard to materiality. My view is that an intent to mislead cannot be obtained from the evidence of record. And so she said that you cannot hang an intent to mislead on that kind of an argument in a cover letter, which it was, covering the art it submitted. And it wasn't a specific representation as to that piece of art, and it wasn't a false translation. We distinguish the kinds of cases, I think she did as well, wherein you can infer intent to mislead. This was a situation where they gave the international search report unabridged and copies of the CHOP PCT. And they were in front of the examiner, and an argument was made in a cover letter that said none of these are deemed to relate to the invention claim. I'm paraphrasing. I'm doing my best to remember exactly what the letter said. Suppose that in a situation, are you suggesting that no attorney argument with regard to what a reference discloses could ever be evidence you could use to prove intent to deceive? Oh, no, Your Honor. But it's not this kind of attorney argument. It's one wherein a false representation of content, a mistranslation of something. I don't think this letter, this cover letter, permits an inference of an intent to mislead. And I would say to the court, it is a case-by-case analysis. I would agree with that. I'm not saying that there's a per se rule that a lawyer can never fraud the United States Patent Office. But that didn't happen here. And in fairness to my argument, I believe it's exactly the issue that she came to her conclusion of no intent by examining the fullness of the trail of what was presented. Isn't that something that should have gone to a jury, that issue of intent? If she's examining it by looking at the fullness of the record and holding this statement up against other things in the record, isn't that creating a possible fact? First of all, I think that courts have a right to say it's in substantial evidence. It can't get there. That's illegal. And in equitable conduct also, of course, I think the court has found it to be an issue of equity in law for the court. And her belief was this was not enough. I mean, basically, as a matter of how she viewed these facts, I can't do better than her own opinion on that. She said it's not enough. But she viewed these facts in the context of summary judgment. You're absolutely right when I misspoke when I said it shouldn't have gone to a jury. Intent is clearly a question of fact, but subject to a bench trial, possibly an advisory trial by a jury. So you're absolutely correct to correct me on that. But nonetheless, shouldn't it have gone to a trial point rather than have her rule it on summary judgment? She thought not for the reasons she stated. She probably would have come out the same way given that she felt so strongly. I understand what the court is asking me. I would respectfully say that I agree with the way Judge Graff analyzed the evidence and found that it did not rise to the level of proof of intent to clear and convincing evidence under the standards of inequitable conduct. She found it just didn't make it. It wasn't enough, and it wasn't like the kinds of representations or misrepresentations or mistranslations that she said has in the past permitted the court to make an inference of intent. Can I ask you on a different issue, now going to the damages issue and the market entry fee question? Yes. Was the jury specifically instructed with respect to market entry fee, or were they just given a general instruction on damages? How did that make its way to the jury? My belief is it had a general instruction. It was not specific. So the market entry fee feature is based on just the testimony, I take it. And I think testimony… I'm sorry, did I say the Resnick 718 was in front of the patent examiner? I had not intended to say that. So 718 was not in front? No, I was intending to say Cha, and I apologize if I misstated something. Your Honor, are you asking me how it was handled in the evidence then? Well, I understood that the reason that there's an argument that there was this improper, what was it, 5.8 million? Yeah, it was 5 million for the market entry fee, 2 million for royalties. Well, that was predicated on evidence that came in at trial. I was curious whether the jury was given an instruction that would have specifically called out the market entry fee. I don't believe so, not to my recollection, Your Honor. I believe it was given standard instruction, unreasonable and not speculative. And the other question, the next follow-up question would be, is there sufficient evidence in the record from which the jury could have found that setting aside a possible market entry fee that damages should still be whatever it was, 7 million? No, I don't think we claim that you can count to 7 without the... So you need the market entry fee. So the legal question is presented to us then, that if the market entry fee should not have been included, then we need to remit. Right, and the court would permit me to at least tell you what the evidence is for that. Of course, that's where I was going. All right, thank you. First of all, there is industry evidence through various witness testimonies that in this industry, I'm going to say pay to play, for want of a better way to put it. And it doesn't matter whether you stay in the market for a year or five years, if you want the technology and the purpose of it, this is a general practice in this particular kind of industry, in the pharmaceutical and in the R&D business as it relates to these kinds of products. And that is to say you recognize, if you will, the cost of getting there from point A to point B. And in this instance, it was $5 million. There are other similar kinds of provisions throughout the marketplace, but of quantitative numbers. Roche, for example, was an example of someone, a licensee, who paid $5 million as part of this practice. And that is the way the industry functions. It's intended, I'm sure, to reward R&D and to reward this little guy who has to go after these kinds of investments and to essentially say if you want to be using, practicing a method of genotyping using my invention, you're going to pay a $5 million entry fee, and then we'll talk about royalties. And that is, I think, the best I can say is it's custom and practice in the industry. It certainly was what happened here, and I respectfully suggest to the Court that that evidence is sufficient. Counsel, would that issue appeal? The market entry fee? I don't think per se, but I'll let counsel— Well, this comes up in the context of the permanent injunction. Yes, it does. And the question of whether the market entry fee should have taken care of the need for a permanent injunction. That's right, and also in some sort of prorated argument, as I recall reading the brief. So I don't know that it was directly appealed. No, through the permanent injunction, that's how the argument arose. So my response to the Court is that there is sufficient and adequate evidence in the record under the Court's instructions as a matter of damage and appropriate entry into this market. This is the practice in the industry, and I think that the evidence is sufficient to justify the jury's award. And I think Judge Crabb delves much. Thank you. I did have a cross appeal. Why don't you— I'm sorry. We've taken up a lot of your time. Why don't you address that very briefly, if you will. I will, Your Honor. And first of all, we had a new case decided, a Seagate case. And here, respectfully, my disagreement with Judge Crabb is that she threw all inferences against us on an issue of fact which the jury decided in her favor. And basically, without in any way characterizing it improperly, I think she said there was an adequate evidence of good faith. And she then took the evidence, reading it from the side of Abbott, and not taking the evidence that we submitted here and the jury heard and agreed with. And it was essentially, I would characterize our evidence as objective evidence. And very much like the Seagate formulation, I argued inferences from objective evidence throughout. So what's the remedy here? We have an apparent new standard for willfulness, at least as I read the Seagate case, a rejection, at least as a matter of affirmative, but I'm not sure on the defense of the element of good faith or the relevance of it. And my suggestion to the Court is, first, I'm entitled to the inferences. This Court de novo will read the record or has the right to read the record in assessing the sufficiency of my evidence in front of a jury. But I would also suggest that if it's read in the context of the new Seagate case, where you have objective recklessness, as I think the standard, that we meet that test. And it is that way I argue. And the evidence basically was that there was no look at the patent office records concerning the examination, no looking at the grounds or reasons for granting the patent as stated in the patent office. There was no viable infringement defense. I mean, I don't think that, honestly, without arguing in much response, that the alternative construction is a logical or fair one as it relates to detecting a complex's form. I think Judge Crabb had it absolutely right for the reasons she stated, and we don't have to do it. In any event, in the obviousness case felt, I want to make clear that her analysis Are you now arguing your case under Seagate to us? Yeah, I was trying to, Your Honor. And Judge Crabb, the one you ought to make that argument to? I'm sorry, Your Honor? You should be making that argument to Judge Crabb, not to us. Well, I'm suggesting that the Court can secure the issue on a de novo review. That you don't pass muster under Seagate? She was correct in the result, but wrong rationale? Here's the dilemma I have, Your Honor. You don't want us to do that? Well, I don't want that. You'd rather have a remand so you can go in front of Judge Crabb again. Yes, Your Honor, and I respectfully understand exactly why you asked me the question. But here's a problem under Seagate for me. Let's assume that the Court reverses and remands. As I read the Seagate decision, part of the jury's determination is going to be based on its view of the liability case. I think that Seagate courts the infringement case. So I've got this problem of if you remand it and a new trial on willfulness is declared because Seagate's a new standard or because the court erred in any way, I'm locked into exactly how I'm going to try the case. And that's sort of what the court just asked me, are you really still arguing Seagate? As I read Seagate, all of what we tried, how we tried it, the sufficiency of their defense, all wraps into the issue of willfulness. And the converse of that is how do I try willfulness under the Seagate mantra without trying the liability case? So I'm suggesting to the court that it can and should review the record in the context of my suggestion that we meet the Seagate standard. Let me ask you this question and just to close off proceedings. I think we need to do that. But I take it, correct me if I'm wrong, but I take it that under the damages statute, the trial judge has discretion to go from no enhancement all the way up to trouble enhancement. And if, therefore, obviously Judge Crabb didn't think that any enhancement was justified in this case for the reasons that she gave under the rubric of finding no willfulness, why can't we assume with some confidence that even if we were to, say, go back and relook at the willfulness issue and she said, well, all right, technically under Seagate there is willfulness, that she wouldn't reach exactly the same result with respect to the enhancement question and give you exactly what you've now got, which is no enhanced damages. Judge Bryson, I think that's a very fair question. It was one I asked myself when I appealed it because it is the bottom line and it is, after all, 284. It gives her discretion, as you suggest. I don't want to be self-serving about this, but I think Judge Crabb is a very good judge. I think the precedent of this court is that if you've got willfulness, you're going to look very hard at the question of enhancement. She already enhanced once in the context of exceptional case with respect to the inequitable conduct. It is my view and confidence in her as a judge and the system as a whole is that if this court feels there is evidence of willfulness, she'll give it a new look. Okay. Very well. We will hear a rebuttal in a couple of minutes. Thank you, Your Honor. Just to be clear, there was judgment as a matter of law entered on the Resnick patent, and that is a de novo ruling contrary to what Mr. Skilton said, and I believe he's corrected that it was not in front of the patent office. In fact, the CHOP ECT application was not referenced on the face of the patent. So there is an inference there. So at the time the examiner was giving us the final word from the examiner, right, in the notice of allowability, that the examiner didn't know about Resnick. The examiner didn't know about Resnick and possibly was steered away from the CHOP ECT application. I think that assumption is a reasonable one, given that there were three representations supporting our inequitable conduct counterclaim. The first one was the one that Judge Moore identified, that without even reading the PCT application, the Patent Council said it wasn't relevant. But the InnoGenetics also represented to the patent office that genotyping in the five-prime UTR, no one had thought of it, and there were no sequences known in the five-prime UTR. And, of course, they did know about CHOP. They were forced to disclaim Probes 77 and 78 in CHOP in the European proceeding a month earlier. Counsel, opposing counsel suggested to me that the reason that the attorney said it wasn't relevant was because it didn't relate to the same invention, meaning genotyping in particular. Refresh my recollection, because I just don't remember from the facts. Is that what the attorney argued was his reason? Did he actually defend his statement that these things are not related to this invention, or did he disclaim it and said, I made a mistake? I just don't remember if there's more that I'm forgetting about in this record. There is absolutely not one mention of the CHOP ECT application in the entire prosecution of the 704 Act. No, that's not what I mean. In the inequitable conduct context, is it the case that this attorney came back and said, well, I made this statement. It wasn't relevant because it wasn't related to genotyping, which I think is what was suggested by counsel. And is that – I just don't know the record as well as you do, and that's why I'm asking you. Is that what happened? I was not trial counsel, but I do not recall seeing anything like that in the record. I believe that, you know, the arguments that were made here today were similar to the arguments, and they are inaccurate as well. The CHOP ECT application discloses specifically, calls it a genotyping analysis, discloses specific hybridization of probes 77 and 78 to their targets in the 5' UTR. At trial, intergenetics had to stipulate, and they did on the record, that probes 77 and 78 in CHOP are identical to sequences 24 and 13 in the 704 patent. So there can't be much dispute that Dr. Cha got it right, that he hit his target. In fact, at the end of the CHOP ECT application, starting at – there are tables 4A to 4E, which identify specifically by DNA string five genotypes of HCV that he distinguished in the 5' UTR through using the same conventional PCR analysis that's disclosed in the 704 patent. I did want to point the Court to the appendix, page 647, because I think it bears on the question being asked of me earlier about how the Court was looking at this distinction between distinguishing and classifying. And I would submit that the Court, at least at the time of the summary judgment motion, when she was construing the claims, did not distinguish at all between distinguishing and classifying. What she says on page 647 is the two proposals submitted by defendant omit the concept of distinguishing among types or subtypes of HCV and classifying them that is at the heart of the 704 patent. And I think that the Court's construction of distinguishing among types and subtypes of HCV is no different than detecting, which you have to do first, in which the 704 patent, in fact, claims, detecting a complex as formed between a probe and nucleic acids of HCV. Right in the claim language, the 704 patent is telling us that they're detecting a complex. They're genotyping. And the complex they're detecting, if there is specific hybridization as there was in CHOP, the probe hits its target, it's aligned, and you know what the genotype is. Turning for a moment to the injunction issue, we appealed the double recovery of the market entry fee and the injunction, and specifically what happened in trial, and I think this is set out in our brief, is that an intergenetics damages expert argued to the jury for the specific amount of $7 million composed of the $5.8 million and the $1.2 million and explained that they should base this market entry fee on the fact that Abbott was going to make future sales of this product and that they shouldn't be limiting their analysis to simply the three years of past infringement. We argued that under 284, that was improper. The court did not give a specific instruction about the market entry fee, but there's no question that they were talking about the market entry fee as lasting for the life of the patent. On the issue of willfulness, briefly, on the lower negligence standard that this court has now changed with the Seagate decision, the lower negligence standard, the court found that no reasonable jury could have found that Abbott acted willfully. In the court below, contrary to their briefs here, intergenetics did not even argue copying, and the court found that they had conceded it. There was no evidence of copying. There wasn't a shred of evidence of bad faith long before Abbott even knew about the 704 patent. When intergenetics had contacted it about another related patent, Abbott did its own due diligence, investigated the patent, had its own patent counsel, a Ph.D. in the relevant science, person of ordinary skill in this art, look at the patent, that person and another Ph.D. scientist, patent lawyer at Celera, the manufacturing arm of this product, contracted with Dorsey and Whitney to take a look at the patent for invalidity a year before intergenetics ever mentioned the 704 patent. And Dorsey and Whitney rendered an opinion that the patent was invalid. It was anticipated by Chuck. That was confirmed and reconfirmed as the evidence that the court has seen shows. There was simply nothing that would support a willfulness argument in this case, and certainly not clear evidence of willfulness. Thank you. Thank you. Nothing was raised, I believe. No, that's not right. I guess that's the cross appeal, right? That was the cross appeal. So technically you have an opportunity for a final rule, but you can wait if you are so inclined. I'm sorry. The issue of copying was contained in the notion that they had the patent, they knew of our enolipa product, and there's a memo that says they took the exact sequences and were proud of it. So what is being suggested is that the way I argued it somehow forfeited it, but my argument was there was copying. And the first time I didn't mention it, I mentioned the evidence. The second time, she said eight sentences, but I said about in those eight sentences what I said now. Your Honor, it's a long argument on why I think there was willfulness. I'm going to have to stand on the briefs and where we did itemize it, and I thank the court for its indulgence. Thank you. And we thank both the counsel. The case is submitted. Thank you.